**David L. COMPTON, Claimant–Respondent,**

v.

**RINEHART's MEAT PROCESSING, Employer–Appellant.**

No. 25566.

Missouri Court of Appeals, Southern District, Division Two.

Feb. 19, 2004.

Motion for Rehearing and Transfer to Supreme Court Denied March 12, 2004.

Application for Transfer Denied April 27, 2004.

William W. Francis, Jr., Terry W. Dodds, Placzek & Francis, Springfield, for appellant.

Paul F. Reichert and Margaret A. Schlachter, Springfield, for respondent.

Before SHRUM, J., RAHMEYER, C.J., and BATES, J.

PER CURIAM.

In this appeal by Rinehart's Meat Processing ("Employer") of an award of workers' compensation benefits, to David L. Compton ("Claimant") for injuries sustained by him on October 19, 1990, Employer challenges the award of past and future nursing services and the finding of total permanent disability. We affirm in part, reverse in part, and remand for fur-

ther proceedings consistent with this opinion.

On October 19, 1990, Claimant was employed by Employer when he reported that an injury to his leg had occurred when he cut his leg while unloading meat inside a trailer. Initially, Claimant felt it was but a scratch and treated it by cleaning it with alcohol; however, he soon noticed redness and soreness around the wound and swelling of his right leg. He was admitted to the emergency room where he stayed for nine days for treatment of an infection. At the time of the injury, Claimant weighed approximately three-hundred-fifty pounds but had never been diagnosed with high blood pressure or diabetes nor had his morbid obesity caused any work-related disability. Claimant returned to work for approximately two-and-one-half months but his right leg became swollen and sore; ultimately, Claimant was referred to an infectious disease specialist who diagnosed chronic recurrent cellulitis and chronic lymphedema. His treating physician recommended further evaluation for a weight loss program, as Claimant's weight complicated both his healing and his ability to function.

Employer and its insurer denied Claimant's claim and refused additional benefits; therefore, two emergency hearings were held prior to the final hearing, which was held on January 10, 2002. The first temporary hearing was conducted on November 9, 1993, at which employer was held liable for past medical expenses in the amount of $120.65, future medical treatment in the form of compressive stockings and oral antibiotics with no further obligations, including no past temporary total disability benefits or any additional temporary total disability benefits. There was no request for compensation for nursing services being provided by Claimant's wife ("Wife") at the first hearing. The second emergency hearing was conducted on May 21, 1996, where Employer was liable for a portion of past medical expenses, future medical care, temporary total disability from July 7, 1994 and continuing but with no determination of the nature and extent of permanent disability. Again, there was no formal request by Claimant for compensation for nursing services provided by his Wife.

At the final hearing, from which this appeal stems, the issues were identified as the obligations of Employer to pay for past and future mileage expenses, past and future nursing expenses, the necessity of future medical care, and the nature and extent of any permanent disabilities. At this hearing, Claimant requested compensation for the assistance his Wife had been providing since the accident, including time spent assisting him with putting on his Jobst stockings and preparing his leg to put on the stockings by applying ointment on any places with tearing, sores, or lesions. Additionally, she claimed time assisting Claimant with his leg exercises, washing his Jobst stockings, rubbing Claimant's leg, preparing a hot bath to help relieve any leg pain, checking vital signs in the morning and at bedtime, and cooking meals. The court awarded past and future nursing expenses from April 1, 1991 to the date of the hearing at a rate of $7.50 per hour for 56 hours per week, based on 8 hours a day, 7 days a week for a total of $215,400 in past expenses, and $8.00 per hour commencing January 30, 2002 into the future as long as Claimant's Wife provided the service. The court also found Claimant to be totally and permanently disabled.

Employer challenges the award of nursing expenses on two grounds: first, a legal basis that no notice was given to Employer thus barring the past award of nursing expenses and, second, a factual basis sup-

porting the need of an award. We find merit to Employer's first and second points. Employer challenges the award of permanent and total disability on the basis that it is not supported by substantial, competent, or credible evidence. Although Employer fails to provide an adequate point relied on in that Employer fails to state why, in the context of the case, the legal reasons support his claim of reversible error,[1] we have reviewed the record *ex gratia* and find no error.

▅ We review the record to determine if it contains sufficient competent and substantial evidence to support the award, i.e., whether the award is contrary to the overwhelming weight of the evidence. *Hampton v. Big Boy Steel Erection,* 121 S.W.3d 220, 223 (Mo. banc 2003). Whether the award is supported by competent and substantial evidence is judged by examining the whole record, and an award that is contrary to the overwhelming weight of the evidence is, in context, not supported by competent and substantial evidence. *Id.*

▅ Employer cites to several cases for the proposition that past nursing care is appropriate only when the employer has notice of the employee's need for such care or when the employee has demanded care and the employer refused, failed, or neglected to provide care. Employer correctly states the general rule. An award for past nursing care is allowable only when the employer had notice of the employee's need for such care or when the

employee demanded care and the employer refused, failed, or neglected to provide the care. *Breckle v. Hawk's Nest, Inc.,* 980 S.W.2d 192, 194 (Mo.App. E.D.1998).[2] The question of constructive notice occurs when the employer may not have been given actual written or verbal notice that nursing services are being requested. For instance, in *Hall v. Fru Con Const. Corp.,* 46 S.W.3d 30 (Mo.App. E.D.2001), although the employee had never specifically requested nursing care from his employer, the fact that he was a paraplegic, had spent approximately three months in the hospital, and his doctor reported that the employee required moderate or stand-by assistance in floor transfers, bed mobility and transfers, car transfers, and curb navigation, along with special accommodation in work and daily activities supported a finding that employer had notice that nursing assistance was needed. *Id.* at 32–33.

There is no question that, in the case before us, no formal, direct notice was given to the Employer prior to the final hearing that past nursing services performed by the Wife would be requested. We must examine the facts of this case to determine whether the Employer had constructive notice. A review of cases in which courts found constructive notice is helpful in making this determination.

As noted *supra,* in *Hall,* constructive notice was found due to the severe injuries to the claimant. The court found that the company had notice as early as the time a

1. *See* Rule 84.04(d). All rule references are to Supreme Court Rules (2003), unless otherwise stated.

2. The standard of review used in *Breckle, Vaught v. Vaughts, Inc./Southern Missouri Const.,* 938 S.W.2d 931 (Mo.App. S.D.1997), *Fitzgerald v. Meyer,* 820 S.W.2d 633 (Mo.App. E.D.1991), *Jerome v. Farmers Produce Exchange,* 797 S.W.2d 565 (Mo.App. W.D.1990) has been expressly overruled in *Hampton v.*

*Big Boy Steel, supra.* Although the standard of review in *Vaught* was cited as being significant in this court's deference to the Commission, we find the two-step process used in *Vaught* did not affect its final analysis as to whether notice was given to the employer nor does it affect ours. We cite to the remaining cases, as the standard of review does not affect the facts and holdings of those cases.

nurse was deposed. The nurse testified as to her knowledge of the nursing needs of the paraplegic claimant, which were being provided by claimant's wife. In *Hall*, there was significant testimony concerning the assistance, which was provided to the claimant.

Likewise, in *Stephens v. Crane Trucking, Inc.*, 446 S.W.2d 772 (Mo.1969), our Supreme Court found sufficient evidence that the employer and insurer knew of the need for nursing services, but failed to offer or provide the services while the claimant was in a "bedfast and helpless" condition. *Id.* at 775. The claimant was initially hospitalized for six weeks for severe injuries and severe shock as a result of a car accident; he was then hospitalized three more times for a significant period of time within the following eight months. *Id.*

*Stephens* is distinguished in *Vaught*. In *Vaught*, the court cited the fact that there was no evidence that claimant ever demanded that the employer provide home nursing care prior to the hearing, nor any evidence that any representative of the employer ever saw claimant while he was hospitalized or at home. 938 S.W.2d at 945. Claimant's wife testified that she informed the insurer that claimant was in a wheel chair and bedridden. *Id.* at 944. When a claims representative of insurer saw claimant's condition in the hospital and at home two years later, he was bedfast and, because his doctors wanted someone with him at all times, wife performed numerous nursing services. *Id.* There was evidence that wife assisted with personal hygiene, massaged claimant's feet and back, supervised medication, served meals in bed, and pushed claimant's wheelchair. *Id.* at 945. This court found that the Commission could have reasonably found that respondents had adequate notice of the need for nursing care, but the evidence

supporting such a finding was not so compelling that the finding of no notice was against the weight of the evidence; thus, we could not substitute our judgment for that of the Commission. *Id.*

In *Fitzgerald*, the court reversed an award of past nursing services based on the lack of notice to the employer. There, the claimant was injured by a backhoe causing crushing injuries to his foot, back, neck, and head, as well as depression and post-traumatic stress syndrome. 820 S.W.2d at 634. The court found as a matter of law that employee was not entitled to past nursing care due to the lack of notice for such care. *Id.* at 635–36.

In contrast stands *Breckle*, where wife, a registered nurse, and denominated as a credible witness, testified that she provided nursing services to the claimant who had injured his back and was totally disabled. 980 S.W.2d at 193. The Commission denied past and future medical care for nursing services and found employee failed to give employer a notice of a need for such services above and beyond. *Id.* at 192–93. The Eastern District of this Court reversed the failure to give benefits and found persuasive the undisputed testimony of claimant that a nurse, sent by the employer's insurance company, had come to claimant's home, accompanied him to doctors' appointments, and participated in decisions about his care. *Id.* The nurse had informed claimant that he would require nursing care after surgery. *Id.* Wife testified that claimant needed constant observation and supervision, meal delivery, help with bathing, and assistance with walking. Claimant was also unable to lift his left arm. *Id.* Of interest is that a registered nurse also testified at the hearing that the claimant was in need of continuous nursing care due to his unpredictable falling. *Id.* In reversing and remanding the denial of past and future nursing ser-

vices, the court noted the positive credibility determination by the ALJ of wife's testimony and the uncontradicted testimony that the employer-provided nurse informed claimant that he needed ongoing nursing care. *Id.* at 194. The court found the wife's services to her husband went beyond the ordinary "duties of a spouse." *Id.*

Claimant, citing to *Breckle*, relies upon the fact that a nurse, Connie Fahey ("Fahey"), was employed by Employer's insurer to monitor Claimant's progress. Claimant points to testimony from Claimant's Wife in which Fahey, as an agent of Employer, was supposedly informed of the need for nursing services. We look to Fahey's testimony to ascertain whether that testimony supports a finding of constructive notice to the Employer that Claimant needed nursing services eight hours per day, seven days per week. Claimant's exhibit, itemizing the eight hours per day that Wife performed "nursing functions" for Claimant, was not provided until the 2002 hearing and is as follows: [3]

| | |
|---|---|
| Give [Claimant] medications 3 times a day | 15 minutes |
| Take Blood pressure 2 times a day | 15 minutes |
| Do blood sugar test 3 times a day | 15 minutes |
| Apply ointment and powder to leg 3–4 times a day | 30 minutes |
| Wash and drying leg 3–4 times a day | 30 minutes |
| Put on hose 3 times a day | 45 minutes |
| Remove hose 3 times a day | 30 minutes |
| Wash hose and hang to dry 3 times a day | 45 minutes |
| Help prop leg above heart 4 times a day | 20 minutes |
| Put on leg pump 2 times a day | 40 minutes |
| Take leg pump off 2 times a day | 40 minutes |
| Leg exercises 1 time a day | 20 minutes |
| Rub back, leg and foot 1 time a day | 20 minutes |
| Prepares 3 meals a day | 70 minutes |
| Short walks 2 times a day | 45 minutes |

The testimony concerning the role of Fahey in the treatment of Claimant was given by Wife at the 2002 hearing.[4] Wife testified that Fahey was an RN assigned to assist in Claimant's health care, help him find doctors that might be able to help him, or, if Wife needed someone to help her find the right pump "and stuff," assist her with finding the right people to do that.[5] Wife testified:

---

**3.** At this juncture, we make no determination whether any or all of these activities constitute proper nursing functions under the facts of this case. We are solely concerned in this point whether notice of necessity of these activities or a demand for such services was given to the employer.

**4.** An objection was made as to the foundation for questions concerning Fahey's connection with Claimant's treatment. The Commissioner allowed the testimony as an offer of proof and stated the objection would be taken under advisement and ruled on later. The transcript does not indicate that the offer of proof was ever ruled upon. The court in its written order does cite to the testimony of Fahey.

Claimant contends we should assume that the objection was overruled and the testimony was properly before the court. Because Employer has not raised the issue of error in the admission of Fahey's testimony in its point relied upon, we will review the testimony as though it were properly admitted.

**5.** Claimant was not using the pump at the time of the 1996 hearing. He began using the pump after May 1996. We disregard the testimony regarding the time involved in hooking up the pump in our analysis of notice to the company as Fahey could not have had notice as to the time involved in the use of the pump because, according to Wife, she was no longer in the case.

She went to the doctor with us one time, and she sat outside the door and listened to the conversation between us and Dr. Godwin. And, you know, she never did—that was the only time we ever seen her, but we talked to her several times on the phone, several times.

And then when I—we'd call her for something, then she'd say she wasn't on our case anymore, and she kind of went out of the picture after she had went with us to the doctor.

But she had made arrangements for us to go to Kansas City, and we seen I believe it was Butin and Crucino (ph.), something on that order is their names in Kansas City.

Wife's testimony as to the nature of her conversation with Fahey concerning Claimant's need for nursing services on a daily basis was:

I told her what he needed done. And she said that—she said whatever the doctor explained that he needed care with for me to try to help, and, if I couldn't to call her. And it seemed like to me every time I called her she was either unavailable or she wasn't there, or when she'd call back, she'd say, "Well, did you get through that problem," you know, and she was there, but she wasn't like a help.

When asked whether Wife made Fahey personally aware of what she was doing for Claimant that she felt was in connection with his injury, Wife responded:

His medicine and his Jobst stockings is the hardest thing, and his—then later on it became his leg pump, that was much later. And the medication, the ointments that goes on his leg and foot from the swelling and propping his leg up.

I also went to her about—it was a lift chair kind of thing one time, and she denied it. She told us, no, that he didn't need it. It was one that would prop his leg up above his heart at the time and she told us, no, that they couldn't do that to help us out. She's said, "There's nothing wrong with him laying on the floor or in a bed and putting his legs on pillows." She said, "It does just as much good. So that's what we've been doing."

Although Wife initially testified that she did not meet Fahey until at least two to three years after the injury, she later corrected herself to state that Wife first met Fahey a little before July of 1991. Wife admitted that although Fahey had never come to Claimant's home, she had instructed her to assist Claimant in making sure his vitals and his blood sugar were normal and that his leg was properly cleaned and kept dry. Wife testified that she had discussions with Fahey on the proper way to put on the Jobst stockings; however, the following questions were asked concerning discussions with Fahey about the services Wife provided:

Q. Did you ever have discussions with Connie Fahey concerning the fact that you were providing these services to [Claimant]?

A. Yes.

Q. And that you might need some assistance with that from time to time?

A. Yes.

Q. Do you know on how many occasions you did that?

A. Several.

Q. What is the last time that you had any contact with Connie Fahey?

A. I'm wanting to say in '96, but I'm not sure of the date or month.

■ A careful review of Wife's testimony reveals that, at the most, Fahey had notice that Claimant was taking medi-

cations, was using Jobst stockings, and elevated his leg several times a day. It is important at this juncture to note that although Claimant has now been diagnosed with additional diseases of hypertension, morbid obesity, and diabetes, none of these diseases was caused by the workplace accident. The ALJ found Employer was not responsible for the medical treatment of the hypertension, morbid obesity, or diabetes, a finding that has not been challenged. It is also important to note that the symptoms of the workplace injury are recurring swelling and infections of Claimant's leg, that Claimant has no disability above the waist, and that Claimant contends to have the swelling, at the most, three or four times per year. Claimant takes an oral antibiotic for the treatment of cellulitis and uses salves when tears or cracks appear in the foot. The remaining medications are for hypertension and diabetes. Significantly, after the initial two hospitalizations, Claimant has not been hospitalized since 1993. Although Claimant argues that the lack of medical intervention is because of the good care that Wife is providing, we are only concerned at this stage with whether the Employer had notice that Claimant required such intensive nursing services.

We must conclude that the award of past nursing services is contrary to the overwhelming evidence. Employer did not have notice of the employee's need for nursing services and Claimant did not demand nursing services prior to the final hearing and, therefore, Employer did not refuse, fail, or neglect to provide such services. Even though we accept Wife's testimony as credible regarding her conversations with Fahey, and assume that Fahey was an authorized individual to have been given constructive notice, the information of Claimant's need to take oral antibiotics

several times per day to prevent cellulitis or to put on Jobst stockings twice per day does not provide notice that Claimant needed nursing assistance eight hours per day, seven days per week, fifty-two weeks a year. Given the relatively minor initial injury, the fact that Claimant returned to work for two-and-a-half months after the injury, and the fact that in the twelve years in which the case was pending no formal or informal demand was made upon Employer for nursing services, we cannot find sufficient evidence of constructive notice to Employer.

The supposed notice during the 1996 hearing regarding the testimony that Claimant's wife assisted with discovering sores in his feet and putting on the Jobst stockings does not provide constructive notice as to the need for intensive nursing services. The cases in which the courts found constructive notice for past nursing services are easily distinguishable in that the severe injuries to the Claimant were immediately and obviously apparent to Employer. See *Hall,* 46 S.W.3d 30 (featuring a paraplegic claimant), *Breckle,* 980 S.W.2d 192 (regarding a claimant who suffered serious back injury); *Stephens,* 446 S.W.2d 772 (involving a claimant in a "helpless bedfast condition"). Point I is granted; the award of past nursing services is reversed.

██ In Point II, Employer contends that the Commission erred when it awarded the Claimant's wife compensation for past [6] and future nursing care services because the evidence and testimony of Claimant and his Wife demonstrated that Claimant is capable of performing these services on his own. We agree in part. Again, looking at Claimant's exhibit regarding Wife's daily services, we find several items that are simply unsupported by the record

---

6. This portion of Point II is rendered moot by    our discussion of Point I.

as necessary nursing services for Claimant's work-related injury.

At the 1996 hearing, Claimant testified that he had at least four episodes of cullulitis infection per year during which his leg became reddish in color, tender, swollen, and hot. With each outbreak, his Wife assisted in putting on a topical antibiotic and he stayed off the leg for a week and a half to two weeks. Claimant testified that his doctor had encouraged him to exercise[7] so he mowed the lawn on a riding mower and with a push mower for thirty minutes to a couple of hours. He picked up sticks and gardened, used a motorized tiller, and bathed himself. He could walk a block and a half, was capable of driving, and could lift fifty pounds of weight. At the 2002 hearing, Claimant testified he hunted for deer yearly; in fact, he gutted a deer and took it to a packinghouse himself. After a tornado damaged his property, Claimant assisted in cleaning up the brush and debris from his deck by loading it onto a tarp and hauling it off to burn. He continued to mow and brush hog their fourteen acres, although he had assistance at times. He occasionally washed the dishes, ran the vacuum cleaner, and fished. He also changed the oil in their vehicles and washed them.

Claimant further testified that he showered and cleaned himself unassisted and was capable of washing and drying his leg three times per day. He could reach all parts of his leg to apply medication while seated, though it would be difficult to reach his feet during a period when the cellulitis was flaring,[8] and had only twice tried to put the stockings on by himself. He was capable of washing his stockings, hanging the stockings to dry, preparing his own meals, and taking his medication, and was able to remove the stockings and elevate his leg without assistance. As for the pump, Claimant felt he could use the pump without assistance, although he was worried about wrinkles in the hose.

The testimony of Claimant and his Wife concerning his functional capacity does not conform to the award of nursing services for eight hours every single day of the week. Some of the claimed services are only necessary during periods of cellulitis outbreak, some of the services are not necessary nursing services at all, and some of the services are not in any way related to Claimant's work-related injury. For instance, the blood pressure checks relate to the hypertension and the blood sugar tests are for diabetes. The only medications for cellulitis are the oral antibiotics and Wife does not need to assist claimant in taking those medications. Further, the testimony does not support nursing services for the preparation of meals or the laundry of the Jobst stockings. Accepting as true all of the limitations given by Claimant and Wife, there simply is not sufficient evidence of a need home nursing services to the extent awarded by the Commission.

A comparison of the award for nursing services in other cases indicates that this award is not in conformity with past awards for nursing services. For instance in *Hall, supra,* even though the claimant was paralyzed as a result of the accident, an award of five hours per day for services rendered by the wife was affirmed. Those services included assistance in showering and dressing the claimant, preparation of meals and laundry, and getting into bed. 46 S.W.3d at 33. Likewise, in *Jerome,* although claimant was paralyzed from the

7. His morbid obesity has complicated the healing of the cellulitis, as well as contributed to hypertension and diabetes.

8. He further testified that it had been two years since he had any cracking in the skin from the swelling.

waist down, the Commission awarded eleven-and-a-half hours per week for home nursing services. *See Fitzgerald,* 820 S.W.2d at 637 (discussing *Jerome* ).

We find this case most similar to *Fitzgerald,* where an award of fifty-six hours per week for home nursing was reversed and remanded for a determination for services that are not above and beyond the services ordinarily performed by a spouse. Based on the record before us, we remand it to the Commission for the development of a record regarding necessary home nursing services. Point II is granted in part and the award of fifty-six hours per week throughout the year is reversed; however, the case is remanded to the Commission for a determination of the appropriate number of hours necessary of nursing services.

■ Point III contends that:

The Labor and Industrial Relations Commission erred when it found that the claimant was permanently and totally disabled in that the award was not supported by the substantial, competent, or credible evidence because the overwhelming weight of the evidence established that the claimant is not totally disabled according to the law.

As noted above, the point relied on wholly fails to state why, in the context of the case, the legal reasons support reversible error. Rule 84.04(d). The point simply states that the overwhelming weight of the evidence establishes that Claimant is not totally disabled according to the law. We have reviewed the volumous legal file and transcript and find that substantial evidence supports the award of permanent disability. Further review of Claimant's disability need not be restated here. Although Claimant is functional in his daily life, his testimony, Wife's testimony, the testimony of his treating physician, and the testimony of his vocational rehabilitation expert combine to provide the competent and substantial evidence to support the award of permanent total disability. Employer essentially argues to this court that according to Employer's experts, Claimant is not permanently and totally disabled. We adhere to the rule of deference to findings of credibility of witnesses to the Commission. *See Stephens,* 446 S.W.2d at 774–75. The award is not contrary to the overwhelming weight of the evidence. Point III is denied.

The award of permanent and total disability is affirmed, the award of past nursing services is reversed, and the award of future nursing services is reversed and remanded to the Commission for further development of the record for necessary home nursing services.